**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 07-1768**

---

MANUEL PENA,

Plaintiff - Appellee,

v.

JEFFREY RAY PORTER; JAMES BENNETT BARBOUR; JASON GLENN
BARNES; THE TOWN OF CLAYTON, The Town of Clayton, NC,

Defendants – Appellants.

--------------------

AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA LEGAL
FOUNDATION, INCORPORATED,

Amicus Supporting Appellee.

---

**No. 07-1891**

---

MANUEL PENA,

Plaintiff - Appellant,

v.

JEFFREY RAY PORTER; JAMES BENNETT BARBOUR; JASON GLENN
BARNES; THE TOWN OF CLAYTON, The Town of Clayton, NC,

Defendants – Appellees.

--------------------

AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA LEGAL FOUNDATION, INCORPORATED,

Amicus Supporting Appellant.

---

Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh.  W. Earl Britt, Senior District Judge.  (5:04-cv-00970-BR)

---

Argued:  September 24, 2008　　　　　Decided:  March 13, 2009

---

Before MICHAEL and TRAXLER, Circuit Judges, and Richard L. VOORHEES, United States District Judge for the Western District of North Carolina, sitting by designation.

---

Affirmed in part, reversed in part, dismissed in part without prejudice, and remanded by unpublished opinion.  Judge Voorhees wrote the opinion, in which Judge Michael and Judge Traxler joined.

---

**ARGUED:** Dan McCord Hartzog, CRANFILL, SUMNER & HARTZOG, L.L.P., Raleigh, North Carolina, for Appellants/Cross-Appellees. Douglas Everette Kingsbery, THARRINGTON SMITH, L.L.P., Raleigh, North Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** Kari R. Johnson, CRANFILL, SUMNER & HARTZOG, L.L.P., Raleigh, North Carolina; Brian E. Edes, CROSSLEY, MCINTOSH & COLLIER, Wilmington, North Carolina, for Appellants/Cross-Appellees. Wade M. Smith, Denise Walker, THARRINGTON SMITH, L.L.P., Raleigh, North Carolina, for Appellee/Cross-Appellant. Katherine Lewis Parker, Legal Director, AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA LEGAL FOUNDATION, INCORPORATED, Raleigh, North Carolina, for Amicus Supporting Appellee/Cross-Appellant.

---

Unpublished opinions are not binding precedent in this circuit.

VOORHEES, District Judge:

This case stems from a police shooting. Plaintiff filed suit in federal district court alleging, inter alia, excessive force, illegal search of his curtilage, racial discrimination in both the search of his curtilage and the use of force, and various state law claims. The district court issued an order granting summary judgment in part to both sides and granting and denying qualified immunity in part, and each side now appeals certain aspects of this decision. For the reasons stated below, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.


I.

Around 10:00 p.m. on a cold February 2, 2004, two probation officers attempted to arrest Rudolpho Gonzales (hereinafter "Gonzales") for probation violations. After the probation officers handcuffed Gonzales, he escaped by simply running away. Unable to find him, the probation officers called the Clayton, North Carolina Police Department for assistance.

Officer Jeffrey Porter (hereinafter "Officer Porter," or collectively "Officers") responded to the call around 10:25 p.m. After conferring with the probation officers, Officer Porter attempted to track Gonzales with his K-9. Officer Porter followed the K-9 north to an American Legion hall, which is

3

across the street from Gonzales's home.  At this point, the K-9 stopped tracking.  Officer Porter and the probation officers decided to terminate their search, but Officer Porter promised to remain vigilant.  The probation officers returned to search Gonzales's home again but ultimately ended their search for the night.

At approximately 10:45 p.m., Officer Porter and his partner decided to search the area south of the Gonzales home. Unsuccessful, Officer Porter then met Officers James Barbour and Jason Barnes to discuss the situation.  Together, the Officers decided to reconstitute their search for Gonzales in the area south of Gonzales's trailer.  While Officer Porter searched for Gonzales around Main Street, Officers Barbour and Barnes searched near the local train tracks.

When this search proved fruitless, Officer Barbour suggested to Officer Barnes that Gonzales might have sought shelter because of the snow and proposed searching the property of Hector Pena, which was roughly 500 feet from the American Legion hall.  A wood-line ran behind the American Legion hall to the rear of the Pena property and beyond.  According to the Officers, this wood-line offered the path of least resistance for an escapee, thus making it a likely route for Gonzales.  As Officers Barbour and Barnes headed toward the Pena property, Officer Porter decided to join them.

4

Although there were approximately forty other homes or trailers in the same general area, Officer Barbour was already familiar with the Pena property, having been there on two previous occasions to investigate a suspicious death and a domestic disturbance. As a result of these encounters, Officer Barbour felt that Hector Pena was "a little crooked" and might be inclined to assist Gonzales. Based on his prior experiences, Officer Barbour also knew that the Pena property contained several uninhabited structures which could shelter Gonzales from the cold and construction equipment which might be useful for cutting handcuffs. Additionally, Officers Porter and Barbour thought that Hector Pena would be more likely to assist Gonzales since the two men were both Hispanic and shared a common language. As Officer Porter explained, "It's been my experience in dealing with the Hispanic community that they tend to help one another more so than what Americans do." J.A. 471.

The Officers arrived at the Pena property around 11:18 p.m. A house, two trailers, several uninhabited storage sheds, chicken coops, and construction equipment utilized in Hector Pena's concrete pouring business occupied the property, which was fronted by Liberty Lane, a public road. A private driveway bisected the Pena property and provided access from the public road to the rear of the property. To the left of the driveway,

5

Hector Pena lived with his family in a house facing Liberty Lane.

Manuel Pena (hereinafter "Pena"), Hector Pena's father, lived further back from the street in a trailer that was located behind Hector Pena's house and likewise sat to the left of the driveway. Pena's trailer was positioned with its front door and access porch facing the rear of the Pena property. A six-foot tall privacy fence screened the trailer from Hector Pena's house and the public road beyond. This fence ran along the back side of the trailer (opposite from the front door), parallel to both the length of the trailer and the public road. The three foot wide area between the trailer and the privacy fence was enclosed on one end by a camper shell and potted plants and on the other end by storage barrels and crates. Within this space, Pena stored toys for his grandchildren and other supplies. Nearby were several chicken coops kept by Pena, which housed approximately 80 chickens.[1]

Slightly farther back from the road and on the right side of the driveway sat another trailer, which housed some of Hector Pena's employees. Scattered around this trailer and Pena's trailer were several storage sheds, construction equipment,

---

[1] Although Hector Pena had legal title to all of the land herein described as the "Pena property," Manuel Pena had exclusive use and control of the property on which his trailer was sited.

cars, and a goat pen, in addition to the aforementioned chicken coops.

The Officers state that they approached the Pena property intending to canvass the area and to investigate the disappearance of Gonzales. According to the Officers, they planned to knock on doors and hoped to find someone who had relevant information. When the Officers arrived, there were no lights on in any of the residences. After turning down the driveway, Officer Barbour first approached the trailer on the right and knocked, but he received no answer. Officer Porter then proceeded to knock on Pena's trailer door. There was no response there either. Officer Porter also peered into this trailer's window, but he did not see anyone at this time.

After receiving no answer, Officer Porter instructed the other officers to continue looking around. The Officers began walking around the area, shining their flashlights and searching for Gonzales. The Officers checked vehicles, outbuildings, and along the chicken coops to see if Gonzales might be hiding anywhere. The Officers also searched the three foot wide space between Pena's trailer and the privacy fence. During this time, the Officers became suspicious because they discovered burning candles, raw meat, beer cans, and a smoldering fire, which indicated to the Officers that people had recently left the property in a hurry.

7

Before leaving, Officer Porter decided to return to the porch of Pena's trailer. Officer Porter shined his flashlight through the window next to the door and this time observed Pena asleep on his bed, and Officer Barbour joined Porter on the porch and confirmed this observation. Officer Barbour then knocked on the door of Pena's trailer a second time, while Barnes and Porter stood off of the porch on either side of the door. As he knocked on the door and window, Officer Barbour stated "mucho panucho,"[2] which, translated loosely, is Spanish slang for "a lot of vagina." At some point shortly after this, Pena came to the door.

When Pena opened the door, he was holding a rifle in one hand. Upon observing this, Officer Porter shouted that Pena had a gun, and Officer Barbour jumped off of the porch. At the same time or shortly thereafter, Officer Porter fired two shots that struck Pena in the upper torso and right arm. Subsequently, Officer Porter and Officer Barbour fired an additional fourteen shots into the trailer.

---

[2] This is the spelling used in the transcripts of the depositions given by the Officers. In Pena's complaint, the word is rendered "penucho." The correct spelling may in fact be "panocha." Regardless, the court will use the spelling "panucho" throughout this opinion. Since this is the spelling provided in the transcript of the Officers' depositions, it probably resembles what was said by Officer Barbour on the night in question most closely.

8

Other than these few general facts, the parties dispute the details of the shooting. Pena admits that he drank at least eight beers while having a cookout with friends earlier in the evening and then fell asleep "hard."[3] Pena asserts that he was not aroused by the knocking on the door and window but rather by the sound of his dogs and chickens. According to Pena, he grabbed his rifle fearing that a fox or other predator was raiding his chicken coops. Although Pena acknowledges going to the door with the rifle, he claims that he held it lowered and in his right hand as he opened the door with his left hand. Pena states that he observed the Officers and their badges, but he avers that the Officers never identified themselves as police, either before or after he came to the door. Pena contends that the Officers immediately opened fire on him, without giving any warning or instructions. Pena denies staring or looking at any one officer prior to being shot.

After being struck by the first two bullets fired by Officer Porter, Pena asserts that he fell back inside and that the spring-hinged door closed automatically. As the door began to close, Pena alleges that Officers Porter and Barbour fired the subsequent fourteen shots into the trailer and through the trailer door. Pena says that he avoided the subsequent fourteen

---

[3] When measured at the hospital after the shooting, Pena's blood alcohol level was .204 mg/dL.

9

shots only because the first two shots had knocked him to the floor. In contrast with the Officers' testimony, Pena does not recall opening the door and threatening the Officers again. However, Pena remembers little after he fell to the floor.

For their part, the Officers state that after Officer Porter identified the gun to the others, Officers Barbour and Barnes sought refuge behind a car and another trailer, respectively. Officer Porter remained in his original position, which was in the open about ten to fifteen feet from Pena's trailer.

Officer Porter contends that all three Officers ordered Pena to drop the gun and to put his hands up.[4] Throughout the confrontation, Officer Porter claims that Pena was uneasy on his feet. Officer Porter also claims that upon coming to the door, Pena began to look around and that Pena's eyes then appeared to lock onto him. According to Officer Porter, at this point Pena began to shoulder his gun. Fearing for his safety, Officer

---

[4] The testimony of the other officers is similar to the testimony of Officer Porter. Officer Barbour testified that Officer Porter said "drop your weapon" twice before opening fire and that numerous other commands were given in Spanish and English as the events unfolded. Officer Barnes's statement to the SBI after the shooting recounted that both Officer Barbour and Officer Porter commanded Pena to put the gun down repeatedly and that Officer Barbour was also saying "put your hands up" in Spanish, although the timing of these commands is not entirely clear from Officer Barnes's statement.

10

Porter says that only then did he fire the first two shots at Pena.

After the first two shots were fired, the Officers state that Pena stumbled back inside, and the door closed. The Officers further state that seconds later, the door reopened and Pena was still holding the gun in a threatening manner. The Officers assert that they again ordered Pena to drop the gun and that Pena again locked his eyes onto Officer Porter. Officers Porter and Barbour then directed a total of fourteen subsequent shots at Pena, none of which struck their intended target. Officer Barnes lacked a clear line of fire and never discharged his weapon. At this point, the Officers testify that Pena again retreated into his trailer, whereupon Officer Porter ordered the Officers to cease fire. After the Officers radioed for assistance, they state that Pena opened the door a third time, stepped out unarmed onto the trailer's small front porch, placed his hands on the porch railing, and collapsed.

Pena filed a complaint on December 22, 2004 alleging, inter alia, violations of the federal and North Carolina constitutions for use of excessive force and illegal search and seizure, as well as state common law claims of invasion of privacy, trespass, assault, battery, gross negligence, and damage to property. The complaint was amended in January 2006 to include a claim for punitive damages and two additional claims brought

11

under the federal constitution and 42 U.S.C. § 1981, which alleged that both the Officers' search of Pena's property and the Officers' use of force against Pena were racially motivated and thus discriminatory. In March 2006, the Officers moved for summary judgment as to all claims, and Pena moved for summary judgment on his claims regarding the search of his curtilage and his bedroom. The district court granted both motions in part and denied both motions in part. This appeal was timely filed by the Officers, and Pena subsequently and timely filed a cross-appeal.

## II.

### A.

The Officers ask this court to review an order denying qualified immunity. Pursuant to 28 U.S.C. § 1291, this court may review any "final decisions" of a district court. "Because qualified immunity is an immunity from having to litigate . . . it is effectively lost if a case is erroneously permitted to go to trial." Gray-Hopkins v. Prince George's County, Md., 309 F.3d 224, 229 (4th Cir. 2002) (quotation omitted). Thus, under the collateral order doctrine, an order of a district court rejecting the defense of qualified immunity is final for the purposes of § 1291. Id. However, our review of orders denying summary judgment based on qualified immunity is limited to a

12

review of the legal issues, such as whether there was a violation of law and whether this law was clearly established. Id. (citing Johnson v. Jones, 515 U.S. 304 (1995)). This court reviews such issues of law de novo. See Washington v. Wilmore, 407 F.3d 274, 281 (4th Cir. 2005). In so doing, this court must accept the facts as viewed by the district court, and this court may not review whether the non-moving party presented evidence sufficient to create a genuine question of material fact. See Gray-Hopkins, 309 F.3d at 229.

B.

The parties also ask this court to review portions of the district court decision granting qualified immunity and granting or denying summary judgment. Because these decisions are not appealable as final orders under 28 U.S.C. § 1291 or as collateral orders under Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949), the parties ask this court to exercise pendent appellate jurisdiction to review these rulings.

Pendent appellate jurisdiction allows this court to consider issues that would not otherwise be immediately appealable if the factual and legal issues involved are "inextricably intertwined" with the questions that are properly before this court on interlocutory appeal. See Swint v. Chambers County Comm'n, 514 U.S. 35, 51 (1995); Rux v. Sudan, 461 F.3d 461, 474-75 (4th Cir. 2006). However, "[p]endent

13

appellate jurisdiction is an exception of limited and narrow application driven by considerations of need, rather than efficiency." Rux, 461 F.3d at 475. As such, it is not sufficient for the exercise of pendent appellate jurisdiction that two legal issues arise from the same set of facts. Instead, issues are "inextricably intertwined" only (1) when this court must decide a pendent issue to ensure effective review of the claims properly raised on interlocutory appeal or (2) when resolution of a properly appealed issue necessarily resolves the pendent issue. Id. at 476. Furthermore, the decision to exercise pendent appellate jurisdiction is purely discretionary. Clem v. Corbeau, 284 F.3d 543, 549 n.2 (4th Cir. 2002). When relevant, the availability of pendent appellate jurisdiction will be discussed in our analysis of the specific claims presented on appeal.

III.

A seizure accomplished with the use of excessive force is unreasonable and violates the Fourth Amendment. See Waterman, 393 F.3d at 476 (citing Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003)). In determining reasonableness, a court must weigh the nature and quality of the intrusion on the individual's right against the countervailing government interest. Graham v. Connor, 490 U.S. 386, 396 (1989). A court

reviewing an excessive use of force claim must determine whether the force employed was objectively reasonable under the circumstances and at the moment of action. See Graham, 490 U.S. at 396-99. In so doing, a court must pay "careful attention to the facts and circumstances of each particular case." Id. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (citation omitted).

The use of deadly force by a police officer is reasonable when the officer has "probable cause" to believe that the suspect poses a threat of serious physical harm to the officer or to others. Tennessee v. Garner, 471 U.S. 1, 11 (1985). Where a suspect poses no immediate threat, the use of deadly force is not justified. However, "if the suspect threatens the officer with a weapon . . . deadly force may be used if necessary . . . and if, where feasible, some warning has been given." Id. at 11-12.

### A.

The district court found that there were genuine issues of material fact precluding summary judgment on Pena's excessive force claim regarding the first two shots fired by Officer Porter. Until these issues could be resolved, the district

15

court held that it was unable to rule on the issue of qualified immunity with respect to this claim.  We agree.

Generally, government officials performing discretionary functions are granted qualified immunity and are thus "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982).  A defense of qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law'," and it "protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines'."  Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005) (citations omitted).  A court evaluating a defense of qualified immunity first must determine whether the plaintiff was deprived of a constitutional right.  If this is the case, the court then looks to see if that right was clearly established at the time of the violation.  See Wilson v. Layne, 526 U.S. 603, 609 (1999).  Only when both of these questions are answered in the affirmative is the defense of qualified immunity unavailable.[5]

---

[5] Although this sequential, two-step procedure is no longer mandatory in light of the recent Supreme Court decision in Pearson v. Callahan, __ U.S. __, __ S. Ct. __ (2009), it may still be followed where appropriate, as in the present case.

Regarding the first two shots, the district court found these few undisputed facts: Pena was asleep inside his trailer, he awoke and came to the door carrying a rifle, he opened the door, and Officer Porter shot him twice in the upper body. For the remaining factual issues, the district court accepted, as it was required to do, the facts as described by Pena. According to Pena's testimony, Pena opened his door with his rifle pointed down; he did not threaten the Officers in any manner; no warnings or commands were given; and Pena was shot almost immediately. The district court concluded that under this version of the events there was sufficient evidence to overcome qualified immunity and to support a claim against Officer Porter. We agree. If this version of the facts is accepted, Pena would pose no immediate threat unless and until he aimed his gun at the Officers, and thus Officer Porter's use of deadly force in this situation would be unreasonable and in violation of clearly established law.

The Officers argue, however, that any disputed facts are irrelevant when deciding the issue of qualified immunity. Regardless of how the events in this case unfolded, the Officers assert that the initial use of force was reasonable simply because Pena was carrying a gun. As support for this claim, the Officers point to several cases from this circuit holding that deadly force was justified in part because the shooting victim

17

was armed.  However, these cases do not stand for a principle as broad as the one articulated by the Officers.  The reasonableness of deadly force must always be adjudged in light of all of the circumstances surrounding the use of force. Although the presence of a weapon (or the reasonable belief that the victim possesses a weapon) is an important factor when determining reasonableness, it is not the only factor.  Contrary to the Officers' interpretation, the police do not have the unfettered authority to shoot any member of the public carrying a gun or other weapon.

In all of the cases cited by the Officers, other circumstances, in addition to the fact that the suspect was armed, were present which gave police the necessary "probable cause to believe that the suspect pose[d] a threat of physical harm, either to the officer or others."  Garner, 471 U.S. at 11. For instance, in Elliot v. Leavitt, 99 F.3d 640 (4th Cir. 1996), the suspect and subsequent shooting victim was arrested, handcuffed, and placed in the back of a police car.  Despite this, the suspect still managed to point a gun at the police officers before being shot.  In Slattery v. Rizzo, 939 F.2d 213 (4th Cir. 1991), the suspect was stopped as part of a narcotics sting and refused to follow the officer's directions to place his hands where they could be seen.  Similarly, in Anderson v. Russell, 247 F.3d 125 (4th Cir. 2001), the officers ordered a

18

man suspected of carrying a gun inside a shopping mall to get on his hands and knees. The man initially complied, but he was shot by a police officer after he lowered his hands and reached behind his back towards a bulge under his clothing.[6] Id. at 128. In McLenagan v. Karnes, 27 F.3d 1002 (4th Cir. 1994), the victim was shot as he was running towards a police officer in the confusing moments immediately after the officer had been warned that an arrestee was loose and had gained access to a magistrate's firearm. Finally, in Sigman v. Chapel Hill, 161 F.3d 782 (4th Cir. 1998), the police knew at the time of the shooting that the victim was drunk and enraged, had just lost his job, had been cutting himself, and had previously threatened -- with a large chef's knife -- his own life, his girlfriend's life, and the police present on the scene.

In contrast, in the present case, accepting Pena's version of events as true, the Officers had no probable cause to believe that Pena was dangerous other than the fact that he possessed a weapon. Pena did not threaten the Officers with the gun, and the Officers did not witness Pena threatening anyone else. The Officers could not have believed that Pena was a violent

---

[6] The bulge was in fact a radio that the suspect was attempting to silence.

criminal.[7]  Furthermore, Pena was not under arrest at the time of the confrontation, and Pena was unaware that police officers were outside his trailer when he opened his front door to make sure that his chickens were safe.[8]  Thus, Pena's decision to bring his gun when he went outside in the middle of the night after being awoken by the sound of his dogs barking and the squawking emanating from his chicken coops was perfectly reasonable, and this should have been apparent to the Officers at the time of the shooting.

This is not a situation, as in Elliot, where the shooting victim had already been arrested by the police, making any effort to access a weapon an attempt at violent resistance. Instead, accepting the truth of Pena's statement, Pena did not know that anyone was outside his trailer when he opened his door.  In addition, this is not a case where the shooting victim

_____

[7] This is true even if the Officers mistakenly believed that Pena was Gonzales.  Gonzales's offenses were all minor and nonviolent.

[8] Although the crucial fact is not what Pena subjectively believed but what the Officers reasonably perceived in light of the circumstances known to them at the time, there is evidence in the record that the Officers did not identify themselves when knocking on Pena's door, thus making it unreasonable for the Officers to believe that Pena's decision to arm himself was a sign of hostility to the police.  In addition, the time of night and the fact that Pena had been sleeping also made it more reasonable for him to bring a gun to the door, which in turn made it less objectively reasonable for the Officers to consider this an act of aggression.

refused to obey police commands in a tense situation, as in Slattery and Anderson, because according to Pena the Officers did not give any commands or warnings prior to the shooting. Nor is this a case where the shooting victim was threatening another person, as in Sigman. Absent any additional factors which would give the Officers probable cause to fear for their safety or for the safety of others, the mere presence of a weapon is not sufficient to justify the use of deadly force.

Viewing the facts in the light most favorable to Pena as found by the district court, we cannot say as a matter of law that Officer Porter's use of force was constitutionally reasonable. If Pena's accusations are true, Officer Porter deprived Pena of his constitutional right to be free from unreasonable seizure, and this right is amply established by past decisions of both the Supreme Court and this court. Thus, we affirm the district court's denial of qualified immunity as to this claim.[9]

### B.

Although the district court refused to grant summary judgment on the first two shots, the district court did grant the Officers' motion for summary judgment as to the subsequent

---

[9] However, qualified immunity may still be available to Officer Porter on this claim if the facts are later determined to support it.

fourteen shots fired by Officers Barbour and Porter. This decision is not appealable under the collateral order doctrine, and it is not appealable as a final judgment at this time. Thus, this court can only consider Pena's appeal if the district court's ruling is the proper subject of pendent appellate jurisdiction.

As discussed previously, pendent appellate jurisdiction only allows this court to review otherwise unappealable decisions if the factual and legal issues involved are "inextricably intertwined" with the questions that are properly before the court on appeal. See Swint, 514 U.S. at 51. When considering whether this court may review the district court's decision regarding the subsequent fourteen shots, the appropriate criteria for determining the availability of pendent appellate jurisdiction is whether resolution of the properly appealed issue (the first two shots) necessarily resolves this issue as well.[10] Rux, 461 F.3d at 476. Crucially, our discussion of the factual and legal issues surrounding the first two shots does not answer the central question presented by Pena's appeal concerning the subsequent fourteen shots: namely, does the firing of the subsequent fourteen shots constitute a

---

[10] Pendent appellate jurisdiction is also available when resolution of a pendent issue is necessary for the disposition of an issue properly before the court on appeal. Rux, 461 F.3d at 476. However, that circumstance is inapplicable here.

22

seizure when Pena was not struck by any of these bullets? Because any ruling on the issue of the subsequent fourteen shots would require us to consider this question, and because this legal issue is not necessarily resolved by our review of the firing of the first two shots, Pena's appeal regarding the subsequent fourteen shots must be dismissed at this time.

IV.

The Officers also appeal the district court's denial of qualified immunity and grant of summary judgment in favor of Pena on his claim that the Officers' search of the area behind his trailer violated the Fourth and Fourteenth Amendments. In ruling on this issue, the district court found that the Officers did in fact search Pena's curtilage without probable cause plus either a warrant or exigent circumstances. Although the district court found that the Officers lawfully approached Pena's trailer to "knock and talk," the district court held that the Officers' subsequent search of the curtilage after receiving no response exceeded any non-search related purpose for remaining on the curtilage and was thus illegal. We agree.

As this court has previously stated, the curtilage of a home "is entitled to the same level of Fourth Amendment protection extended to the home, so that, as with the home, probable cause . . . is the appropriate standard for searches of

23

curtilage." Rogers v. Pendleton, 249 F.3d 279, 287 (4th Cir. 2001). A police officer may enter the curtilage of a home for certain purposes unconnected with a search, but if police conduct thereafter exceeds any legitimate reason unconnected with a search of the curtilage justifying the officer's presence, a Fourth Amendment violation has occurred.[11] Although police officers have the same right as any private citizen to approach a residence to "knock and talk" with the inhabitants, this right does not confer authority on police officers to make a general investigation of the curtilage. Id. at 289-90.

In the present case, the Officers do not deny that they entered the curtilage of Pena's property and looked around and behind Pena's trailer without a search warrant. However, the Officers argue that this behavior did not violate the Fourth Amendment because they were allowed to proceed to the rear of the trailer in an attempt to contact Pena when he did not respond to the knocking on the trailer's front door.

In Alvarez v. Montgomery County, 147 F.3d 354, 356 (4th Cir. 1998), this court aligned itself with several other circuits in holding that "[t]he Fourth Amendment does not prohibit police, attempting to speak with a homeowner, from

---

[11] For example, in Rogers, the police exceeded their legitimate purpose for entering the curtilage (contacting the homeowner) when the officers attempted to search the backyard of a home after speaking with the owner and being asked to leave.

24

entering the backyard when circumstances indicate they might find him there."  In that case, the police received a 911 call reporting underage drinking at a house party.  Upon arriving at the home, the police officers saw a sign in the front yard stating "Party in Back" with an arrow pointing to the backyard.  In an effort to contact the homeowner, the officers then proceeded to the backyard where they observed underage drinking.  In affirming summary judgment in favor of the police officers, this court held that the officers did not violate the Fourth Amendment since the officers had a "legitimate reason" for entering the property unconnected with a search of the premises and since their conduct comported with that purpose.  Id. at 358-59.

The decision in Alvarez relied in part on this court's earlier decision in United States v. Bradshaw, 490 F.2d 1097 (4th Cir. 1974).  In that case, federal and state agents were investigating the defendant for the production of moonshine.  After detecting the aroma of moonshine emanating from an apparently abandoned vehicle which lay beyond the limits of the defendant's property, the agents were spotted by the defendant as he returned by car to his home.  Fearing that the defendant would remove any contraband on his property if they left, one of the agents approached the front door of the defendant's house to question him.  The defendant did not answer, and so the agent

25

decided to try the back door of the home.  On the way to the rear door, the agent passed another truck parked near the house, which also "exuded a strong odor of moonshine whiskey."  Id. at 1099.  The agent then deviated from his intended path to examine the truck.  Upon peering through a crack in the rear door, the agent spotted moonshine, which he subsequently seized.  In overturning the defendant's conviction, this court held that:

> [The agent was] clearly entitled to go onto defendant's premises in order to question him concerning the abandoned vehicle near his property. Furthermore, we cannot say that [the agent] exceeded the scope of his legitimate purpose for being there by walking around to the back door when he was unable to get an answer at the front door.  It follows that [the agent] got within smelling range of the truck in which the liquor was found without unjustifiably intruding into defendant's fourth amendment zone of privacy . . . . However, [the agent] did not 'discover' the liquor until he actually saw it through the crack between the rear doors of the truck . . . . It was not possible for [the agent] to make this confirmatory observation without exceeding the original purpose of his intrusion, which had justified his presence on defendant's property up to that point, and making a further intrusion into an area of protected privacy.

Id. at 1100-01.

The Officers' conduct in this case violated the Fourth Amendment.  The Officers admitted that their reason for entering the curtilage of Pena's property was to conduct a search for Gonzales.  Even though the Officers had the right to approach Pena's trailer to knock and talk, when Pena did not answer the knocking at the front door, unlike in Alvarez or Bradshaw there

26

was no reason to expect that knocking on a backdoor would produce a different result. Pena's trailer was less than 10 feet wide, so there was no reason to believe that a knock at the back door would be heard by an occupant when a knock at the front door had produced no response. In addition, the Officers had not witnessed anyone enter the trailer, and there were no lights on in the trailer to show that anyone was home, much less awake. Finally, there was no sign directing people to the rear of the trailer, and there were no noises coming from the rear of the trailer indicating the presence of the homeowner. For all of these reasons, we agree with the finding of the district court that the evidence "does not suggest that the [O]fficers had reason to believe that any resident might be in the backyard of plaintiff's camper or that they were going to a back door." J.A. 183.

Furthermore, even if the Officers' decision to walk to the back of the trailer was reasonable as part of an effort to speak with the trailer's owner, the Officers nonetheless exceeded this legitimate purpose by searching the private, enclosed storage area abutting Pena's trailer and by continuing to search the curtilage after it quickly became apparent that Pena's trailer lacked a rear door. Although the Officers were suspicious of the scene they discovered upon their arrival at the Pena residence, no evidence of any kind linked Gonzales to this

27

particular property.  Thus, these suspicions fell far short of the probable cause necessary to support a search, and the Officers also lacked both a warrant and exigent circumstances.[12]

The Officers also claim that their actions were justified as a protective sweep of the area.  Police may conduct a protective sweep when they have a reasonable belief, based on specific and articulable facts, that there is an imminent threat to their safety.  Maryland v. Buie, 494 U.S. 325, 327 (1990).  However, "[p]rotective sweeps are not justified as a matter of course."  Fishbein v. Glenwood Springs, 469 F.3d 957, 962 (10th Cir. 2006) (citation omitted).  A protective sweep is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found."  Buie, 494 U.S. at 335.  As such, a protective sweep may not last longer than is necessary to ensure the officers' safety.  Id. at 335-36.  Although Buie allowed for a protective sweep in the specific context of an arrest, several circuits have since held that a protective sweep is reasonable in other situations as well.  See e.g., United States v. Gould, 364 F.3d 578 (5th Cir. 2004) (allowing protective sweep after deputy sheriffs entered a trailer home with occupant's consent); United States v. Taylor,

---

[12]  Although exigent circumstances might exist if the Officers had probable cause to believe that Gonzales was on the property, a vague "hunch" that Gonzales might be present certainly does not satisfy this requirement.

28

248 F.3d 506 (6th Cir. 2001) (approving protective sweep after consent entry of home); United States v. Garcia, 997 F.2d 1273 (9th Cir. 1993) (same).[13]

Most cases to consider the constitutionality of protective sweeps arise from police sweeps within personal homes. Outside of a home, the risk of danger to police officers is substantially diminished. See United States v. Carter, 360 F.3d 1235, 1242-43 (10th Cir. 2004). However, in a pre-Buie decision, this court held that a protective sweep of curtilage contemporaneous to an arrest was constitutional where the police officers had a reasonable fear for their safety. United States v. Bernard, 757 F.2d 1439 (4th Cir. 1985).

In the present case, the Officers' conduct cannot be condoned as a protective sweep because the Officers have failed to articulate specific facts demonstrating that they reasonably feared for their safety. The Officers point to the raw chicken, empty beer cans, and smoldering fire as evidence that people had only recently left the property, and Officer Barbour opined, "It's always an uneasy feeling when you got somebody on the run and you could be standing on top of that somebody and not know

---

[13] This circuit has not squarely addressed the constitutionality of a protective sweep made in circumstances other than an arrest. Since we hold that a protective sweep was not justified on the facts of this case for other reasons, we do not need to decide this issue at present.

29

it." J.A. 824. However, nothing in these facts suggests danger. Only an unsubstantiated "hunch" connected Gonzales -- a nonviolent offender -- with the Pena property. The scene that greeted the Officers upon their arrival showed no evidence of unlawful activity, and there was no reason to believe that the people who had recently been grilling chicken would pose any threat to the police. Although the Officers may have subjectively believed that the atmosphere that night was eerie, this is not a specific, articulable fact that indicates the Officers reasonably feared for their own safety.

Thus, the Officers' attempts to explain their presence within Pena's curtilage as something other than a search are unconvincing. Because the Officers searched the curtilage of Pena's property without probable cause plus either a warrant or exigent circumstances, the Officers violated Pena's Fourth Amendment right to be free from unreasonable searches, and this right is clearly established. Our decisions in both Rogers and Alvarez make plain that the curtilage of a home is afforded the same Fourth Amendment protection as the home itself. Therefore, we affirm the district court's denial of qualified immunity on this claim.

We likewise affirm the grant of summary judgment in favor of Pena on this claim. In their briefs, the Officers acknowledge that "there are no factual disputes" regarding the

30

search of Pena's curtilage.  Br. Appellant 38.  In fact, Pena was asleep as these events unfolded, and all relevant facts were furnished by the Officers' testimony.  Thus, our resolution of the qualified immunity issue necessarily resolves this issue as well.

V.

Pena next contends that the Officers' search of his property and the Officers' allegedly excessive use of force were racially motivated and thus violated 42 U.S.C. § 1981.  To bring a claim under § 1981, a plaintiff must demonstrate (1) that he is a member of a racial minority, (2) that defendants had the intent to discriminate against him on the basis of his race, and (3) that the defendants' discrimination concerned one of the statute's enumerated activities.  Brown v. City of Oneonta, 221 F.3d 329, 339 (2d Cir. 2000).

Pena also asserts a cause of action under the Fourth and Fourteenth Amendments based on the same facts.  However, "subjective motives are irrelevant to a proper Fourth Amendment analysis," and thus Pena's constitutional claims of racial discrimination are properly analyzed under the equal protection clause of the Fourteenth Amendment, not the Fourth Amendment. United States v. Bullock, 94 F.3d 896, 899 (4th Cir. 1996) (citing Whren v. United States, 517 U.S. 806, 812-13 (1996)).

31

In order to establish a violation of the equal protection clause, and to satisfy the second element of a § 1981 claim, a plaintiff must be able to show purposeful discrimination. Gen. Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 390 (1982). This circuit has never decided whether racially motivated searches and seizures fall within § 1981's enumerated activities and thus satisfy the third prong of a § 1981 claim. However, assuming without deciding that these claims are viable under § 1981, Pena's statutory and constitutional claims still fail because he has not established that the Officers' conduct was the result of purposeful discrimination. Thus, the Officers did not violate a statutory or constitutional right, and they are entitled to qualified immunity.

A.

Pena's evidence of racial discrimination relating to the search of his trailer's curtilage is insufficient to establish a violation of either his constitutional rights or 42 U.S.C. § 1981.[14] Although Pena correctly asserts that he is not required to show that racial animus was the sole motivation for the allegedly discriminatory conduct, Pena must at a minimum be able

---

[14] Because the district court did not fully set forth the facts on which its decision was based, this court assumes the facts that may reasonably be inferred from the record when viewed in the light most favorable to Pena. Waterman, 393 F.3d at 473.

to show that he was treated differently because of his race. See Farm Labor Org. v. Ohio State Highway Patrol, 308 F.3d 523, 536 (6th Cir. 2002). Because the Officers have articulated multiple credible, race-neutral criteria supporting their decision to investigate the property, which Pena does not dispute, Pena is unable to meet this burden.

Several race-neutral factors led the Officers to the Pena property. First, the Pena property lies in close proximity to the American Legion Post where the police canine lost Gonzalez's scent, and the Officers felt that the wood line near the Pena property offered the path of least resistance for an escapee. Although other trailer homes are in the same general vicinity, the Officers focused on the Pena property as a result of additional reasons peculiar to that property. For one, Pena's property contains multiple residences, several unoccupied structures including two sheds, and numerous large pieces of equipment related to Pena's business as a cement layer. Having been to the Pena property previously, Officer Barbour was aware of these conditions and felt that they would afford a good place for Gonzalez to hide. Officer Barbour also believed that the tools necessary for cutting handcuffs could be found among this construction equipment.

The circumstances surrounding Officer Barbour's prior contact with the Pena property were an additional race-neutral

33

factor supporting the decision to investigate this specific location. On two separate occasions, Officer Barbour had been called to the Pena property to investigate possibly criminal incidents. A suspicious death had occurred on the property, and Barbour had also responded to a report of a domestic dispute.[15] For all of these reasons, Pena's property was distinct in Barbour's mind and stood out from the other nearby residences. In light of this location-specific information, the Pena property was a logical place for the Officers to inquire about Gonzalez, especially when considered in light of its close proximity to the last place where the police canine indicated.

In the face of this evidence, Pena argues that the Officers' racial animus is shown by (1) the Officers' use of shared language as a justification for their investigation of the Pena property, (2) Officer Barbour's use of the crude slang phrase "mucho panucho" in an attempt to rouse Pena and have him answer the door, and (3) the Officers' testimony that in their experience the Hispanic community tended to help other Hispanics. The court will address each of these facts in turn.

First, the use of shared language as a justification for a search is not per se racially discriminatory. See Hernandez v.

---

[15] In fact, more than one domestic dispute had been reported to the police, but it appears from the record that Officer Barbour only responded to one of these disturbances. See J.A. 793, 1087

New York, 500 U.S. 352, 363 (1991); United States v. Ortiz, 422 U.S. 891, 897 (1975) (listing ability to speak English as relevant for establishing probable cause to search vehicles near the Mexican-American border).  In Hernandez, the Supreme Court recognized that a prosecutor's exercise of peremptory challenges based on the ability of jurors to speak Spanish "raised a plausible, though not a necessary, inference that language might be a pretext for what in fact were race-based peremptory challenges," but in that case the Supreme Court refused to overturn the trial court's decision that there was no discriminatory intent.  500 U.S. at 363 (emphasis added).

Admittedly, the shared language of Gonzalez and Pena does not predispose Pena to aid Gonzalez.  However, a shared language does increase the likelihood that Pena could assist Gonzalez if he wished, whereas a language barrier would hinder effective communication and assistance.  Although "shared language" may at times serve as a post hoc, race-neutral rationalization of racially discriminatory motives, there is no evidence to support this conclusion in the present case.  The Officers did not target Spanish-speaking Hispanics for investigation while refusing to question Spanish language speakers of different races or ethnicities.  In fact, the record does not show that the Officers knew of any other Spanish speakers who lived nearby.

By itself, shared language might not be enough to establish a race neutral justification for a search. However, in the instant case, this factor was one of many leading the Officers to the Pena property. When viewed in conjunction with all of the other reasons leading to the search of the Pena property, the presence of a shared language does have some tendency, if only slight, to increase the likelihood that Pena might have aided Gonzalez.

Second, Officer Barbour's use of the phrase "mucho panucho" in attempting to have Pena answer the door of his trailer, while offensive, is likewise not indicative of racial animus. "Mucho panucho" is not a racial slur, and Officer Barbour was not using the phrase to describe Pena. Instead, Officer Barbour was using the phrase in an admittedly "childish" attempt to bond with Pena and to make Pena more receptive to answering the door.[16] J.A. 847. Although Officer Barbour stated that he would not use a similar phrase when dealing with Caucasians, this hesitancy likely stemmed not from racial bias but from his inability to transpose the cultural context of this slang phrase. Removed from this cultural context slang lacks meaning, and even a

---

[16] According to Officer Barbour's uncontradicted testimony, this phrase is used widely among Hispanic males in the area. Officer Barbour felt that employing the phrase would make him sound like "one of the guys" and thus less threatening. J.A. 847.

direct translation of a slang phrase will be inaccurate or incomplete. See J.A. 846-48. If Officer Barbour believed the phrase was a racial insult, he would not have felt that employing the phrase would increase Pena's inclination to open the door.

Finally, the Officers' belief that Hispanics were more likely to aid other Hispanics is perhaps the most troubling explanation offered for their investigation of the Pena property. However, considering all of the other circumstances surrounding the Officers' decision to target the Pena property, Pena has not presented sufficient evidence to establish racial animus or to show that the Officers' decision would have been different if Pena was not Hispanic.[17]

Since there was no violation of Pena's constitutional or statutory rights as alleged in this claim, the Officers are

---

[17] Pena points to the case of Lankford v. Gelston as factually similar to the instant case. 364 F.2d 197 (4th Cir. 1966). In that case, the Baltimore, Maryland police targeted the homes of black residents for warrantless searches after a police shooting, based solely on the Police Department's belief that black residents would be more likely to aid the suspects in the shooting, who were also black. More than 300 homes were searched over a period of 19 days. However, that case is clearly distinguishable from the case at bar. In the instant case, the Officers did not target the Pena residence on the sole basis of Pena's race, and the Officers did not indiscriminately target other Hispanic residences in the nearby area, much less in the community at large as in Lankford.

37

entitled to qualified immunity. Accordingly, the district court's denial of qualified immunity on this claim is reversed.

B.

We affirm the dismissal of Pena's claim for racial discrimination in the use of the allegedly excessive force for the same reasons enunciated above. Because the factual and legal issues surrounding both claims of discrimination are identical, our decision that the search of Pena's curtilage was not discriminatory necessarily entails the same result on the claim for discriminatory use of force, and the exercise of pendent appellate jurisdiction is appropriate.

Furthermore, this court notes that the evidence of racial discrimination in the use of force is even more tenuous than in the Officers' initial decision to investigate the Pena property. None of the evidence offered by Pena demonstrates that the Officers were more likely to use force against him because of his race. Undeniably, Pena answered his door armed with a rifle. Although the Officers' subsequent use of force may or may not have been reasonable, nothing suggests that this decision to use force was motivated by anything other than the Officers' genuine fear for their own safety.

VI.

Pena also alleges numerous violations of state law arising out of the same encounter with the police. The Officers appeal the district court's decision to deny summary judgment on Pena's claims for assault, battery, gross negligence, damage to property, and state and federal law claims of punitive damages. Pena appeals the district court's decision to grant summary judgment in favor of the Officers on Pena's state law claims for trespass and invasion of privacy.

The Officers' appeal regarding the denial of summary judgment on Pena's state law claims for assault and battery is meritless. These claims are "subsumed within the federal excessive force claim and so go forward as well." Rowland v. Perry, 41 F.3d 167, 174 (4th Cir. 1994). As to the other state law issues (and the federal claim for punitive damages) appealed by the Officers, they are not the proper subject of interlocutory review. Because these claims raise separate legal issues from the claims properly presented to us on appeal, the exercise of pendent appellate jurisdiction is also inappropriate. Therefore, these appeals will be dismissed.

Likewise, neither state law claim Pena asks us to review is the proper subject of an immediate appeal. Although the trespass claim arises from the same facts as Pena's Fourth Amendment claim for an illegal search of his curtilage, Pena

39

appeals the district court's decision to dismiss this claim based on public official immunity. Because this argument raises distinct legal issues that are not intertwined with any issue properly before us on appeal, pendent appellate jurisdiction is unavailable to allow for a review of this ruling at this time. Similarly, the state law claim for invasion of privacy requires resolution of unique legal issues unconnected with the denial of qualified immunity, and therefore we must also decline to review this claim. Accordingly, these appeals are dismissed as well.

VII.

In sum, we affirm the district court's denial of qualified immunity as to the first two shots fired by Officer Porter, we affirm the district court's denial of qualified immunity and grant of summary judgment on Pena's claim for an illegal search of his curtilage, we reverse the district court's denial of qualified immunity as to Pena's claim that the search of his curtilage was racially motivated, we affirm the district court's decision to dismiss Pena's claim of racial discrimination in the Officers' use of allegedly excessive force, and we affirm the district court's decision denying summary judgment in favor of the Officers on Pena's state law claims for assault and battery.

Furthermore, we decline to entertain Pena's appeal of the district court's decision to grant summary judgment and

qualified immunity to the Officers regarding the subsequent fourteen shots. We likewise refuse to review all other remaining appeals of both parties concerning Pena's state law claims and federal claim for punitive damages. None of these issues are properly before us on appeal at this time, and none are subject to the exercise of pendent appellate jurisdiction. Accordingly, these appeals are dismissed without prejudice.

This case is remanded to the district court for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART,
DISMISSED IN PART WITHOUT PREJUDICE,
AND REMANDED
